```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION


Neil Edwin Wilson,             :

        Plaintiff,             :

    v.                         :    Case No. 2:10-cv-0087

Commissioner of Social Security,:   JUDGE HOLSCHUH

        Defendant.             :
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Neil Edwin Wilson, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability benefits and supplemental security income.  Those applications were both filed in 2005 and alleged that plaintiff became disabled on June 1, 1999.

After initial administrative denials of his claim, plaintiff was afforded a hearing before an Administrative Law Judge on February 19, 2009.  In a decision dated April 28, 2009, the Administrative Law Judge denied benefits.  That decision became the final decision of the Commissioner when the Appeals Council denied review on November 30, 2009.

Plaintiff thereafter timely commenced this civil action. The record of administrative proceedings was filed in this Court on April 6, 2010.  Plaintiff filed a statement of specific errors on June 6, 2010, to which the Commissioner responded on September 8, 2010.  No reply brief has been filed, and the matter is now ripe for decision.

II. Plaintiff's Testimony

Plaintiff's testimony appears at pages 335 through 362 of the administrative record and can be summarized as follows.

Plaintiff was born on February 19, 1965 and completed two years of college.  He lives in an apartment with his fiancée, his daughter, and her son.  He climbs the stairs in his apartment three or four times daily, but has trouble doing so.  He drives occasionally and had not taken any trips in the 10 years prior to the hearing.

Plaintiff testified that he is not a serious drinker but at one time had problems with marijuana and cocaine.  However, he had been straight for two years, and when he used drugs, the frequency of that use varied from a few times a week to a few times a month.  He was convicted of cocaine possession and served some time in jail as a result.  That was not his first conviction for drug possession.  When he was using drugs, it did affect his ability to work.

Plaintiff had a cane with him at the administrative hearing. He believed that his doctor prescribed a cane for him as early as 2005.  He is on a number of medications which cause various side effects such as dizziness, nausea, diarrhea, headache, and nervousness.

In 1999, plaintiff worked at the Ohio State University Hospital through a temporary service.  He had that job for slightly more than a year and mainly sat and watched monitors. However, he was sometimes required to lift patients.  He did some contract labor from 2002 through 2005 on an inconsistent basis. He stopped working due to his injuries.  Another job he held in the past involved sales and stocking goods for a clothing company.  He had to lift 50 or 60 pounds of clothing while working there.

During a typical day, plaintiff reads and listens to music. His sister takes care of many of the household duties such as cooking, cleaning, and laundry.  Plaintiff is able to visit friends and to go to doctor's appointments.  A few days a month,

he stays in bed all day.  He sleeps during the day.  He can lift five pounds occasionally and can sit 10 to 30 minutes at a time.  In an eight hour day, he would be alternating between sitting, standing, and lying down.  He cannot be on his feet more than 15 minutes at a time.

Plaintiff's counsel asked him questions about his gunshot wounds.  The first one was in his hip area and the second one was in the back.  He has pain from the middle of his back down to his left foot.  He experiences muscle spasm and leg weakness.  His back locks up two or three times a month depending upon his activity level.  He worries about being shot again, worries about dying, and has had nightmares of the shooting incidents.  He suffers from depression and crying spells, and believes his emotions would affect his ability to work.  He had one evaluation for mental health issues but has never had treatment.

### III.   The Medical Records

The pertinent medical records show the following.  Because plaintiff's statement of specific errors focuses exclusively on his physical impairments, only those records will be summarized.

The first medical report in the record is dated August 10, 2005.  It states that plaintiff came to the emergency room after being shot.  The diagnosis was gunshot wound to the left buttock.  The plan was to admit him to the hospital for observation and therapy.  An x-ray showed a bullet fragment in the left femur. (Tr. 100-111).

Nine days later, plaintiff was back in the emergency room being treated for left foot drop.  He also reported numbness which was giving him difficulty sleeping.  Most of the numbness he reported was in his left leg below the knee.  At that time, he could stand up from a squatting position without any assistance and the doctor could not appreciate any sensory loss.  He was prescribed medication as well as an orthotic device.  (Tr. 112-

17).

Plaintiff came back to the emergency room on September 4, 2005 complaining of left lower quadrant pain.  A CT scan was performed which showed no abnormalities.  The source of his pain could not be determined and he was discharged with instructions to take over-the-counter pain medication as needed.  (Tr. 118-20).

At some point, plaintiff began seeing Dr. Skully as his regular physician.  After examining plaintiff on December 4, 2006, Dr. Skully filled out a form indicating that plaintiff was unemployable.  On the form, he indicated that plaintiff's medical conditions resulted both from the 2005 gunshot would and a January, 2006 gunshot wound to his lower back.  Dr. Skully thought plaintiff could stand or walk for less than an hour in a workday, sit for only an hour or two, could not lift any weight at all, and was from moderately to extremely limited in his ability to push, pull, bend, and perform repetitive foot movements.  (Tr. 168-69).

Based on plaintiff's report of low back pain, Dr. Skully asked for an MRI to be done on May 21, 2007.  The study showed some mild to moderate degenerative disc disease at several levels as well as some disc protrusion and mild stenosis.  (Tr. 178).  On February 11, 2008, Dr. Skully filled out another medical form repeating his conclusion that plaintiff was not employable.  This form indicated restrictions more severe than the ones contained on the prior form.  (Tr. 179-81).  He also submitted a number of progress notes showing his treatment of plaintiff throughout this period.  Those notes included a plan to refer plaintiff to a specialist for further treatment of his chronic pain.  (Tr. 182-264).

Plaintiff was seen by a neurologist on April 30, 2008.  The study done at that time was abnormal but there was no evidence of

radiculopathy. (Tr. 265-66). He was then seen at the Olentangy Pain Clinic by Dr. Kumar beginning on February 12, 2008. At that time, he exhibited increased pain on lateral motion on the left side. The assessment included degenerative disc disease, lumbar radiculopathy, arthritis, myofascial pain, and other medical problems. His medication regimen appeared to be reasonable but he was a candidate for an epidural steroid injection. He was seen again on May 24, 2008 continuing to complain of lower back pain with radiation down the left side. His medication was described as giving him a "90% benefit" but he did wish to consider other treatment options. He was described as being in mild distress at the time of the visit. Subsequently, on June 28, 2008, he was given an epidural steroid injection. (Tr. 267-70).

    Plaintiff began seeing Dr. Phillips on August 18, 2008. At that time he reported a history of chronic low back pain due to two gunshot wounds. His pain was constant and radiated down his left leg and he also had left hip pain. His medications had not changed. He was not in any acute distress and did not appear chronically ill. His diagnoses included lumbago and he was given various medications. He saw Dr. Phillips again on September 8, 2008 and reported that his medication was helpful. He showed some tenderness on palpation of the spine. (Tr. 274-79).

    The last two records in the file are also forms completed by Dr. Skully, apparently in 2009. One form indicates that plaintiff can lift and carry 10 pounds occasionally and sit for two hours as well as stand for four hours in a workday. The other indicates much more severe restrictions. (Tr. 324-27).

IV.   <u>The Expert Testimony</u>

    Dr. Nusbaum, a medical expert, also testified at the administrative hearing. His testimony can be found at pages 362 through 370 of the record. He first testified that there was no

evidence of any significant impairment prior to 2005. He noted that an MRI showed protrusions at L3/4 and L4/5 with mild central and foraminal stenosis. There was no evidence of radiculopathy. Plaintiff had a history of cocaine use with a positive screen in 2005. He received a gunshot wound to the buttocks in August of 2005 and was diagnosed with left foot drop. He had been taking Percocet and Neurontin since that date. He also had a left peroneal neuropathy related to his gunshot wound and wore a foot brace. He also had some arthritis in his hips.

Dr. Nusbaum expressed the opinion that, beginning in August of 2005, plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could sit for two hours at a time and up to six hours in a workday, and could stand for an hour at a time and up to four hours in a workday. He could not walk more than 15 minutes at a time. He could not climb ladders or use left foot controls and would be limited in his ability to stoop, squat, crouch, and climb stairs. Dr. Nusbaum thought that the records from plaintiff's pain specialist showed that his pain was under control and he also thought it unlikely that plaintiff suffered from the side effects of his medications which he described.

A vocational expert, Mr. Rosenthal, also testified at the administrative hearing (pp. 370-81). He described plaintiff's past work as involving heavy, medium, or light exertion and being either unskilled or semiskilled. He did not have any transferable job skills. If plaintiff were limited as described by Dr. Nusbaum, he could do a small percentage of the light jobs available in the economy, but he could do up to 35% of the sedentary jobs. Examples of either light or sedentary jobs which plaintiff could perform would include cashier, ticket sales person, security monitor, envelope addresser, and order clerk. However, if plaintiff were as limited as he testified, he could not work due to the restrictions on his ability to sit, stand,

and walk and the fact that he sleeps much of the day.  Also, if he had the limitations described by various exhibits prepared by Dr. Skully, he could not work.

### V. The Administrative Decision

The ALJ found, and plaintiff does not dispute, that plaintiff met the insured status requirements for his disability claim only through September 30, 2002, and that he had not worked since June 1, 1999.  Because there are no records that pre-date the 2005 gunshot wound, it would appear that this case involves only the denial of plaintiff's claim for supplemental security income benefits, since there is no evidence that he was disabled for any reason prior to September 30, 2002.

The ALJ concluded that the record supported the existence of four severe impairments: mild lumbar stenosis, degenerative joint disease of the hips, left peroneal nerve palsy with left foot drop, and marijuana and cocaine abuse in sustained remission.  Again, plaintiff does not take issue with this finding or argue that other conditions should have been found to be severe, so the Court accepts this finding as well.

Where plaintiff and the ALJ part company is on the ALJ's determination of how much these severe impairments affect plaintiff's ability to do work-related activities.  The ALJ did not believe that the record contained sufficient objective medical evidence to substantiate pain as severe and disabling as plaintiff claimed.  She pointed out that records from the pain clinic contained many normal finding such as full motor strength and no sensory deficits.  The ALJ also noted that plaintiff's medication had been effective in controlling his symptoms, and she pointed out a number of factors which undercut his credibility.

The ALJ recognized that, in this case, Dr. Skully had filled out a number of forms which, taken at face value, would require a

finding that plaintiff was disabled.  She discounted his opinions, however, because there was not sufficient clinical and laboratory data cited in support of his conclusions, those conclusions appeared to be based upon plaintiff's subjective descriptions of his complaints rather than on objective clinical testing, the clinical tests which were done showed only mild conditions inconsistent with Dr. Skully's severe restrictions on plaintiff's ability to sit, stand, or walk, and Dr. Skully's progress notes were inconsistent with some of those findings.  As a result, the ALJ concluded that his opinions were not entitled to any significant weight.

Having thus dispensed with Dr. Skully's opinions, the administrative decision turned to the question of plaintiff's residual functional capacity.  Although the decision does not tie its residual functional capacity finding directly to Dr. Nusbaum's testimony, it essentially adopts his opinion on this issue with a minor difference in the amount of time that plaintiff could stand or walk without interruption.  Based on the vocational expert's testimony that someone with that residual functional capacity would be able to perform a substantial number of both light and sedentary jobs, the administrative decision concluded the plaintiff was not under a disability at any time and therefore denied his applications for benefits.  (Tr. 15-27).

VI.  <u>Legal Analysis</u>

In his statement of errors, plaintiff raises two issues.  He first argues that the Commissioner failed to give the appropriate weight to the opinions of his treating physician, Dr. Skully.  Second, he asserts that the finding about his residual functional capacity is not supported by substantial evidence.  The Court applies the familiar "substantial evidence" standard of review to these contentions and briefly sets out that standard.

<u>Standard of Review</u>.  Under the provisions of 42 U.S.C.

Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Secretary's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Secretary's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Secretary's decision must be affirmed so long as his determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

    The first question in this case (as it is in many social security cases) is whether the administrative decision has complied with both the procedural and substantive requirements which must be met before an ALJ may properly reject the opinion of a claimant's treating physician about what the plaintiff can and cannot do. The applicable regulation, 20 C.F.R. §404.1527(d)(2), has been interpreted by the Court of Appeals to require not only that there be "good reasons" for rejecting the opinions of a treating medical source, but that the ALJ's

decision state what those reasons are.  See, e.g., Wilson v. Commission of Social Security, 378 F.3d 541 (6th Cir. 2004). This is so because the regulation in question states, as a general matter, that the opinions of treating physicians are to be given "controlling weight" - that is, they will be accepted for exactly what they say - if the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  If they are not accorded such weight (and several subparts of the rule explain why they might not be), §1404.1527(d)(2) requires the ALJ to "give good reasons ... for the weight we give [the] treating source's opinion."

    Here, the ALJ accepted the fact that Dr. Skully qualifies as a "treating source" under §404.1527, and that if the requirements of that rule were met, his opinions would be entitled to controlling weight.  However, the administrative decision cited "multiple reasons" why it was not being given that much weight. They included the fact that he did not provide "sufficient clinical and laboratory data" to support his conclusions; that his opinions appeared to be based more on what his patient told him than on any objective findings; that the various tests either cited by Dr. Skully or in the record, such as the MRI from 2007 or the EMG from 2008, do not show conditions so serious that they would preclude the plaintiff from doing almost any work-related activity; and that, at times, Dr. Skully himself reported findings inconsistent with plaintiff's supposed limitations, including the fact that plaintiff was consistently described as "ambulatory" and not needing a cane despite the fact that Dr. Skully limited his standing to 10-15 minutes at a time, and the fact that he stated in progress notes that plaintiff's medication was controlling his pain and that he was in no distress.  (Tr. 24-25).  For these reasons, the ALJ concluded that not only were

Dr. Skully's opinions not entitled to controlling weight, they were "not entitled to any significant weight ...."  (Tr. 25).

Plaintiff argues that these reasons for giving less than controlling weight to Dr. Skully's opinions are not sufficient to satisfy the requirements set forth in §404.1527(d).  He points out that Dr. Skully relied not just on plaintiff's self-report of symptoms but on objective tests such as the MRI and EMG tests which were performed.  He also argues that the ALJ has misinterpreted the evidence concerning the consistency between Dr. Skully's progress notes and his opinions, and that the notes, although they may not always state that plaintiff needs a cane, clearly say he needed a foot brace to correct his foot drop. Further, although Dr. Skully's notes do describe plaintiff's pain as controlled to some extent, they do not show complete control, and they describe his pain in other ways that is consistent with severe limitations on his ability to sit, stand, or walk. Finally, plaintiff faults the ALJ for not recognizing that the objective findings of Dr. Kumar and Dr. Phillips support Dr. Skully's opinions as well.

Certainly, as plaintiff's memorandum states, an ALJ may not discredit a treating physician's opinions simply by taking a few isolated statements in the record out of context and using them as support for the administrative decision.  That is a well-established principle of social security law and this Court adheres to it.  See, e.g., Rothgeb v. Astrue, 626 F.Supp. 2d 797, 808 (S.D. Ohio 2009) (per Ovington, M.J.).  On the other hand, as the court in Carroll v. Astrue, 2010 WL 2643420, *8 (N.D. Ohio July 1, 2010) notes, citing Kornecky v. Commissioner of Social Security, 167 Fed. Appx. 496, 508 (6th Cir. February 9, 2006), an ALJ also need not address every single item of evidence in the record in reaching or justifying the administrative decision. Although Kornecky did not involve the rejection of a treating

-11-

physician's opinions under §404.1527(d), it is still true that as long as the administrative decision explains the reasons for rejecting a treating physician's opinion in enough detail so that both the claimant and a reviewing court can understand it, and if that explanation is based on a fair and reasonable (rather than a selective) reading of the record, the reviewing court must give deference to the administrative decision.  See, e.g., Jones v. Commissioner of Social Security, 336 F.3d 469, 477 (6th Cir. 2003).

    This case is very much like the one considered in McGlothin v. Commissioner of Social Security, 299 Fed. Appx. 516 (6th Cir. October 31, 2008).  There, like here, the treating physician's opinions were discounted because the only objective test, an EMG, showed only a mild condition, and because the physician's assessment was based on the subjective complaints of a claimant who was determined to be less than credible.  The court deferred to the administrative decision, which actually rejected the opinions of three treating sources in favor of the opinion of a non-examining state agency physician because the ALJ had given valid reasons for not accepting those opinions and the record supported those reasons.  Here, too, the two objective tests cited by Dr. Skully did not show particularly severe conditions, and there was little else that supported his extreme restrictions other than what plaintiff was telling him.  Further, in contrast to how plaintiff characterizes their views, neither Dr. Kumar nor Dr. Phillips appear to have concluded that plaintiff could not do even the minimum requirements of sedentary work, and Dr. Nusbaum believed he could do more than that.  Finally, the ALJ did review all of the evidence in some detail, and the references cited to either the lack of documented need for a cane or to plaintiff's being in no distress and having his symptoms controlled by medication are not isolated.  For all of these reasons, the Court

must defer to the ALJ's determination that Dr. Skully's views were not controlling.

Plaintiff also argues that, even if Dr. Skully's opinions were not entitled to complete deference, they still should have been given substantial weight due to the long-standing treatment relationship he developed with plaintiff. Certainly, and especially given the significant lack of objective evidence, both the ALJ and Dr. Nusbaum did give some weight to Dr. Skully's view that plaintiff had some serious limits on his ability to lift, stand, sit, walk, and carry. Had his views (which were not completely consistent over time) been given more weight, it is still not clear that the ALJ would have found plaintiff to be unable to do even sedentary work. Most of the jobs identified by the vocational expert were sedentary jobs, and at least some of them would not involve any significant lifting. Although the Court does not believe that any error was committed concerning how much weight was actually given to Dr. Skully's opinions, if there was an error, it was harmless.

Plaintiff's second argument is that the administrative decision did not specifically cite to Dr. Nusbaum's testimony as the basis for the residual functional capacity finding that was made, and that because there are slight differences between his testimony and that finding, the record does not demonstrate how the ALJ reached her conclusion on this issue. Even if the ALJ should have found, as Dr. Nusbaum testified, that plaintiff's walking was limited to 15 minutes at a time instead of sixty minutes at a time, the vocational expert's testimony was specifically based on the residual functional capacity described by Dr. Nusbaum. At page 375 of the record, Mr. Rosenthal was asked to assume a person who had "the limitations identified ... by Dr. Nusbaum during his testimony." Although that person could not do any of plaintiff's past work, such a person could do the

light and sedentary jobs which Mr. Rosenthal described. Consequently, even if the ALJ had completely adopted Dr. Nusbaum's view of plaintiff's abilities, she would still have reached the conclusion that he was not disabled. Thus, this second argument does not give the Court any basis for overturning that decision.

### VII. Conclusion

For all of the reasons cited in Section VI of this Report and Recommendation, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner.

### VIII. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d

947 (6th Cir. 1981).

                                                /s/ Terence P. Kemp
                                                United States Magistrate Judge